Adam W. Cook, ABA #0611071
Arina Filippenko, ABA #2311138
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, Alaska 99501
acook@bhb.com
afilippenko@bhb.com
Telephone 907.276.1550
Facsimile 907.276.3680

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA for the use and benefit of PRUHS CONSTRUCTION COMPANY, LLC, an Alaska limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>KIEWIT INFRASTRUCTURE WEST CO., a Delaware corporation; and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA Payment Bond No. 107618018, a Connecticut corporation,<br><br>Defendant. | Case No. 3:26-cv-_________<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Pruhs Construction Company, LLC, by and through its undersigned counsel, alleges as follows against Defendants Kiewit Infrastructure West Co. and Travelers Casualty and Surety Company of America:

## PRELIMINARY STATEMENT

1. This action arises from the construction of the Extend Runway 16/34 project at Joint Base Elmendorf-Richardson, Alaska, U.S. Army Corps of Engineers Contract No. W911KB22C0012 (the "Project"). Plaintiff Pruhs Construction Company, LLC ("Pruhs") furnished labor, materials, and equipment to the Project as the paving, milling, base course, and aggregate production subcontractor to Defendant Kiewit Infrastructure West Co. ("Kiewit"), the prime contractor on the Project. Defendant Travelers Casualty and Surety Company of America ("Travelers") is the surety on Kiewit's payment bond for the Project.

2. Kiewit has failed to pay Pruhs in full for base-contract and change-order work that Pruhs performed and that Kiewit does not dispute was completed; has refused to compensate Pruhs for directed changes, constructive changes, Kiewit-caused delays, and the consequences of the unsuitable borrow source that Kiewit designated; has imposed unsupported deductions and backcharges; and wrongfully terminated a substantial portion of Pruhs' scope for default on account of a condition, the unsuitability of the Pit 3 aggregate for airfield hot-mix asphalt, that was Kiewit's responsibility and that Kiewit itself acknowledged to the Government.

3. Pruhs brings this action to recover the sums due to it under the Miller Act, 40 U.S.C. §§ 3131–3134, and under the parties' subcontract and Alaska law.

## PARTIES

4. Plaintiff Pruhs Construction Company, LLC is a limited liability company organized under the laws of the State of Alaska with its principal place of business at 2193 Viking Drive, Anchorage, Alaska 99501.

5. Pruhs' sole member is Pruhs Corporation, a corporation organized under the laws of the State of Alaska with its principal place of business at 2193 Viking Drive, Anchorage, Alaska 99501. Pruhs is therefore a citizen of the State of Alaska for purposes of 28 U.S.C. § 1332.

6. Defendant Kiewit Infrastructure West Co. is a Delaware corporation with its principal place of business in the State of Washington, at 2200 Columbia House Blvd., Vancouver, Washington 98661.

7. Defendant Travelers Casualty and Surety Company of America is a Connecticut corporation with its principal place of business at One Tower Square, Hartford, Connecticut 06183. Travelers is, on information and belief, authorized to transact surety business in the State of Alaska.

8. The United States of America is a nominal party only, in whose name this action is brought for the use and benefit of Pruhs pursuant to 40 U.S.C. § 3133(b)(3)(A).

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over the Miller Act claim under 40 U.S.C. § 3133(b)(3) and 28 U.S.C. § 1331 because that claim arises under the laws of the United States.

10. This Court has supplemental jurisdiction over Pruhs' claims against Kiewit under 28 U.S.C. § 1367(a) because those claims arise from the same subcontract, Project, and payment dispute as the Miller Act claim and form part of the same case or controversy.

11. Additionally, jurisdiction also exists under 28 U.S.C. § 1332(a) because the Plaintiff and Defendants are completely diverse and the amount in controversy exceeds $75,000.

12. Venue is proper in the District of Alaska under 40 U.S.C. § 3133(b)(3)(B) because the prime contract was to be performed and executed at Joint Base Elmendorf-Richardson, within this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

13. This action is timely under 40 U.S.C. § 3133(b)(4). Pruhs last performed labor and furnished material on the Project on or about October 24, 2025, and this action is brought within one year of that date.

14. Pruhs contracted directly with Kiewit, the prime contractor and bond principal, and therefore was not required to give the 90-day notice described in 40 U.S.C. § 3133(b)(2). Pruhs nonetheless gave Travelers written notice of its claim on January 22, 2026.

## FACTUAL ALLEGATIONS

**A. The Prime Contract and the Payment Bond**

15. The U.S. Army Corps of Engineers ("USACE", "Owner" or the "Government") awarded Kiewit Contract No. W911KB22C0012 (the "Prime Contract") for construction of the Project.

16. As required by 40 U.S.C. § 3131(b)(2), Kiewit, as principal, and Travelers, as surety, executed Payment Bond No. 107618018 on Standard Form 25A, dated July 26, 2022, in the penal sum of $69,125,000.00 (the "Payment Bond"). A true and correct copy of the Payment Bond is attached as Exhibit 1.

**B. The Subcontract**

17. On or about October 19, 2022, Kiewit and Pruhs entered into Subcontract No. 7200009877 (the "Subcontract"), under which Pruhs agreed to furnish supervision, labor, tools, equipment, materials, and supplies to perform the paving scope described in Attachment A of the Subcontract, including asphalt paving, asphalt milling, crack repair, Gilsonite modified asphalt emulsion seal coat, and the manufacture of base course, asphalt, and open-graded drainage material ("OGM"). A true and correct copy of the Subcontract is attached as Exhibit 2.

18. The original Subcontract price was $26,455,334.00, which was adjusted for differences between estimated and actual quantities, approved changes, additions, and deductions.

19. Section 3 of the Subcontract requires Kiewit to make monthly partial payments and, upon complete performance and Owner acceptance, final payment

of the balance due. Exhibit A to the Subcontract, Sections 1.5 and 1.6, further obligate Kiewit to pay Pruhs in accordance with FAR 52.232-27, Prompt Payment for Construction Contracts, and to pay an interest penalty on each payment not made in accordance with that clause.

20. Section 5 of the Subcontract entitles Pruhs to an adjustment in the Subcontract price for changes directed by Kiewit where Pruhs provides written notice of its intent to claim an adjustment.

21. Section 6(f) of the Subcontract permits Kiewit to terminate for convenience on five days' written notice and entitles Pruhs, in that event, to payment for all work properly performed, partial payment for lump-sum items based on percent complete, and reimbursement of reasonable close-out costs. Section 6(b) permits termination for default only where Pruhs "fails to comply or becomes disabled from complying" with the Subcontract and fails to correct the failure within five days after written request.

22. Section 20 of the Subcontract provides that "[i]n the event either party institutes suit in court against the other party or against the surety of such party, in connection with any disputed matter arising under the Subcontract, the prevailing party shall be entitled to recover all costs, expenses and attorney fees in addition to any other relief granted by the court."

**C. Kiewit Directed Pruhs to Use Pit 3 as Its Aggregate Source**

23. During the bid process, Kiewit instructed Pruhs to price its scope using an on-site, Project-provided borrow source for aggregates, except blend sand.

24. The Prime Contract placed responsibility for selecting, testing and developing the borrow sources on Kiewit, as prime contractor.

25. Kiewit had opportunity to investigate the borrow sites before executing Pruhs' Subcontract.

26. Kiewit designated Aggregate Area 3 at JBER ("Pit 3") as the aggregate source from which Pruhs was to manufacture aggregates, including aggregates for airfield hot-mix asphalt ("HMA").

27. Beginning in December 2022, Pruhs repeatedly notified Kiewit in writing that Pit 3 did not contain sufficient competent material, that approximately 2.5 acres of the pit appeared unsuitable for aggregate production, and that conditions differed from the bid documents.

28. By letter S-0284 to USACE dated December 20, 2024, Kiewit itself represented that it had "determined that the provided sources are unsuitable for airfield asphalt aggregates as currently specified," acknowledged that its technical proposal stated that OGM and HMA would be processed from Pit 3, and estimated that the cost of obtaining off-base aggregates would exceed $5 million.

**D. The Binder Change and the Airfield Job Mix Formula**

29. Pruhs' PG 64-40ER job mix formula ("JMF") was approved in August 2023.

30. The Government thereafter directed a change in binder from PG 64-40ER to PG 58E-34 under Modification P00020 (CR00044-1), issued May 17, 2024. Kiewit directed Pruhs to proceed with the change notwithstanding that its

costs would exceed the not-to-exceed amount, and Kiewit thereby assumed responsibility to Pruhs for the costs of that directive.

31. Under the Project specifications, Kiewit's Airfield Asphalt Pavement QC Manager was responsible for mix design adjustments.

32. From May 2024 through January 2025, Pruhs worked diligently with Kiewit to develop an approved airfield JMF for the changed binder from the existing Pit 3 aggregates, engaging multiple laboratories and mix-design firms and testing alternative sources.

33. Despite those efforts, no laboratory produced a conforming airfield JMF from the designated material, and another contractor's HMA produced from a similar on-base source also failed.

**E. Kiewit's Wrongful Partial Termination**

34. On February 11, 2025, by letter PCC-028, Kiewit partially terminated the Subcontract for default under Section 6, removing the airfield HMA scope and related work on the stated ground that Pruhs had failed to provide a compliant airfield JMF and suitable aggregate.

35. Pruhs timely disputed the termination in writing, including by letters dated February 13 and February 19, 2025, identifying it as a wrongful partial termination.

36. Kiewit's partial termination of the Subcontract in February 2025 was wrongful. Kiewit based the termination on Pruhs' alleged failure to produce a

conforming airfield JMF; however, Pruhs was not responsible for locating, selecting or furnishing the aggregate source.

37. Kiewit controlled the selection of and furnishing of an acceptable borrow source, and Kiewit designated Pit 3 for Pruhs' use.

38. The inability to produce an approved airfield JMF resulted from the unsuitability of the source selected by Kiewit, the binder change, the requirements imposed during mix development, and Kiewit's failure to fulfill its contractual quality control and mix-design responsibilities, not from any default by Pruhs.

39. Pruhs continued pursuing alternative mixes and sources when Kiewit issued its partial termination.

40. After terminating Pruhs, Kiewit procured washed aggregates from an off-base source approximately 40 miles north of Anchorage and engaged a replacement HMA subcontractor that used a different aggregate source in their mix design.

41. Kiewit thereafter asserted a claim against Pruhs' performance bond surety arising from the partial termination; however, Kiewit failed to substantiate its claim.

**F. Pruhs' Performance and Changed Work**

42. Pruhs timely performed its Subcontract work that was made available to it on the Project.

43. Kiewit directed Pruhs to perform numerous out-of-scope work items and changed work that delayed Pruhs' work and added unexpected costs to its

performance, including additional OGM production, intersection-closure milling, winter detour paving, Airlifter Road changes under CR-00052 and CR-00076, Airlifter Bottom Lift work, an elevation change at Charlie Loop under CR-00084, additional GCABC supply, RAP and HMA quantity overruns caused by unsuitable subgrade, and extended equipment standby.

44. Pruhs provided written notice and pricing for the changed and additional work. For items where Kiewit expressly approved pricing, Pruhs performed in reliance on those commitments. Kiewit subsequently reduced agreed prices or payable quantities, or withheld payment.

45. To the extent notice was necessary for any of the conditions associated with Pruhs' claims, Pruhs timely gave such notice by letter, by electronic mail, or orally in the field to Kiewit's project personnel. In the alternative, to the extent any notice was not given in the form or within the time the Subcontract requires, any formal notice requirement is excused or unenforceable because: (a) Kiewit had actual, contemporaneous knowledge of the operative facts, having directed, observed, or controlled the work at issue; (b) Kiewit suffered no prejudice from any defect in the form or timing of notice; and (c) Kiewit waived strict compliance, and is estopped from insisting on it, through its course of dealing on the Project.

46. Kiewit also enforced against Pruhs a fractured-face acceptance requirement for graded crushed aggregate base course that was omitted from the specification's enumerated testing requirements and not applied in the

Government-approved initial-test submittal, directed removal and recrushing of material, and imposed a per-sieve compliance standard, all at substantial additional cost to Pruhs.

47. Kiewit further prevented Pruhs from recovering its costs by removing scope from the Subcontract before Pruhs could install replacement material it had already produced at Kiewit's direction. By removing scope at that point, Kiewit deprived Pruhs of the opportunity to install, and to be paid for, the replacement material, and left Pruhs bearing the cost of producing it.

**G. Kiewit's Undisclosed Airlifter Road Modifications**

48. Upon information and belief, Kiewit obtained a modification, or modifications, to contend with differing site conditions relative to work associated with the construction of Airlifter Road, but never communicated with Pruhs regarding differing site conditions at that location or potential impacts to Pruhs' performance based upon actual site conditions at that location of the Project.

49. At no point in time did Kiewit ever request cost information from Pruhs regarding differing site conditions on Airlifter Road, nor did they discuss the existence of differing site conditions on Airlifter Road with Pruhs prior to Pruhs' mobilization at that location of the Project.

**H. Project Delays**

50. Throughout its performance, Pruhs' work was repeatedly delayed, disrupted, and re-sequenced by causes beyond its control.

51. The original Project schedule provided that the entirety of Pruhs' Subcontract scope would be complete by the Fall of 2024. Because of delays outside of Pruhs' control, Pruhs continued performing available work through October 2025. A significant portion of Pruhs' remaining scope was not made available for Pruhs to complete in 2025, and Kiewit did not permit Pruhs to return in 2026 to complete that work. Kiewit has not compensated Pruhs for delays to its work or close-out costs.

52. Delays outside Pruhs' control disrupted the original project schedule from the very start of performance. In 2023, a stop-work notice halted runway milling, and Pit 3's unsuitable material and stockpile constraints stopped aggregate production.

53. In 2024 and 2025, Kiewit-controlled predecessor work, utility conflicts, deficient subgrade, and repeated week-to-week deferrals kept contracted scope unavailable.

54. Pruhs' road paving was pushed into later seasons twice, and its crews and equipment were left on standby.

55. Because of these delays, Pruhs had to keep its pugmill, crusher, and asphalt plant committed to the Project far beyond the planned performance period.

56. It also had to perform retained work at higher 2025 labor rates.

57. Due to the delays outlined above, along with out-of-scope work requirements and project-related changes, Pruhs overall performance was delayed in excess of 300 calendar days.

## I. Kiewit's Failure to Pay and Pruhs' Request for Equitable Adjustment

58. Kiewit has a history of late and withheld payment on the Project. As early as November 2023, Pruhs gave Kiewit written notice of breach of payment terms.

59. In what Kiewit characterized as its closeout accounting, it reallocated prior payments to Pruhs among schedule-of-values items, proposed deductions through an unexecuted change order, and asserted backcharge and scope deductions, ultimately concluding that Pruhs was not entitled to further payment. Kiewit failed to provide documentation supporting those charges or its accounting, despite Pruhs' requests.

60. In fact, in correspondence dated December 15, 2025, Kiewit acknowledged Pruhs' request for additional information but stated that "no additional information will be sent at this time."

61. Despite Pruhs' requests, Kiewit also has not provided Pruhs with electronic versions of the Project schedules that Kiewit submitted to USACE, or with the Prime Contract modifications, requests for equitable adjustment, and Government correspondence bearing on the conditions underlying Pruhs' claims.

62. On or about September 28, 2026, Pruhs submitted to Kiewit a signed, formal Request for Equitable Adjustment (the "REA"), which Pruhs incorporates by reference. The REA claims $22,007,519.10, consisting of contract and change-order balances of $8,335,572.65, requests for equitable adjustment of $10,964,439.16, and termination profit and overhead damages of $2,707,507.29.

63. Pruhs also provided a copy of the September 28, 2026 REA to Travelers.

64. Kiewit has not paid the amounts due to Pruhs under the Subcontract.

65. Travelers has not paid Pruhs any amount on its bond claim.

66. All conditions precedent to Pruhs' right to recover have been performed, have occurred, have been excused, or have been waived.

67. Pruhs' claims for unpaid contract and change order balances, for Kiewit's unsupported deductions and backcharges, and for Kiewit's wrongful termination concern Kiewit's own conduct. They are disputes between these parties only, which the Subcontract expressly makes subject to adjudication.

68. Pruhs' equitable adjustment claims likewise arise from Kiewit's own acts and risk allocation, including Kiewit's designation of Pit 3, Kiewit's direction to proceed with the binder change beyond the not-to-exceed amount, Kiewit's enforcement of acceptance criteria not contained in the specifications, Kiewit's sequencing and failure to make work available, and Kiewit's independent decisions relative to Airlifter Road, among other things.

69. In the alternative, to the extent that any portion of Pruhs' claims are found to involve parties other than Kiewit, such as the Government, then any condition precedent to immediate adjudication is excused because Kiewit has prevented its satisfaction. Kiewit possesses the Prime Contract modifications, Government correspondence, and schedules necessary to evaluate whether the Owner bears any responsibility for Pruhs' claims, and Kiewit has refused to provide

that information despite repeated requests from Pruhs and from Pruhs' performance bond surety.

70. Moreover, specific to the Government, any claim submitted to it that is in excess of $100,000 must be certified under the Contract Disputes Act, 41 U.S.C. § 7103(b). Due to Kiewit's failure and refusal to share information with Pruhs and the language of the agreement between the parties, even if any aspect of Pruhs' claim could be the responsibility of the Government, certification would expose Pruhs to liability under 41 U.S.C. § 7103(c)(2) and the False Claims Act, 31 U.S.C. § 3729 et seq., as it does not possess all information pertinent to investigate such issues. Only Kiewit and the Government have that information.

71. Accordingly, to the extent that any portion of Pruhs' claims are potentially the responsibility of the Government, any condition precedent regarding the same is excused by Kiewit's failure and refusal to provide information to Pruhs. Alternatively, any such portion of Pruhs' claim is severable from Pruhs' remaining claims, which concern Kiewit alone.

72. Kiewit has further waived, and is estopped from relying on, any conditions precedent to immediate adjudication of all claims as part of this action, based upon Kiewit's aforementioned conduct, which consisted of independent acts and directives that caused harm to Pruhs.

73. None of the issues set forth above, limits Travelers' obligations under the Miller Act, 40 U.S.C. § 3131 et seq., or the Payment Bond.

**COUNT I**
**Miller Act Payment Bond, 40 U.S.C. § 3133(b)**
**(Pruhs v. Travelers)**

74. Pruhs hereby incorporates all preceding paragraphs as though fully set forth at length.

75. Pursuant to the terms of the Payment Bond, Travelers is obligated, as surety for Kiewit, to pay Pruhs for all services and materials provided by Pruhs on the Project for the benefit of Kiewit, for which payment has not been made.

76. Travelers has failed to fulfill its obligation under the Bond to pay Pruhs for labor, services, and materials furnished in the prosecution of work provided for the Prime Contract, for which Kiewit failed to make payment.

77. Pursuant to 40 U.S.C. § 3133(b) of the Miller Act, every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under the Act and that has not been paid in full within 90 days after the day on which the person performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought.

78. It has been more than 90 days since Pruhs last supplied labor or material to the Project, and Pruhs has not been paid in full by Kiewit.

79. This Complaint is being filed within one year of the date upon which Pruhs performed its final work on the Project.

80. Pruhs is entitled to payment from Travelers pursuant to the Miller Act, 40 U.S.C. §3133 for all labor, material and equipment furnished by Pruhs on the Project for which it has not been paid.

81. All conditions precedent to commencing an action under the Payment Bond have been satisfied by Pruhs or have otherwise been waived by Travelers and/or Kiewit.

**COUNT II**
**Breach of Contract**
**(Pruhs v. Kiewit)**

82. Pruhs hereby incorporates all preceding paragraphs as though fully set forth at length.

83. Pruhs and Kiewit entered into the Subcontract for the performance of work at the Project.

84. Pruhs performed its obligations under the Subcontract.

85. Kiewit has breached the Subcontract in that it has failed and refused to pay Pruhs in full for labor, services and materials furnished in the prosecution of the work provided for in the Prime Contract and pursuant to the Subcontract.

86. Kiewit further breached the Subcontract by, among other things: (a) failing to pay contract balances for completed work; (b) failing to pay for directed changes and extra work at the agreed or reasonable prices; (c) failing to pay for quantity overruns that Kiewit directed or solicited; (d) failing to grant equitable adjustments for changed, constructively changed, and delayed work and for the consequences of the Kiewit-designated borrow source; (e) taking unilateral,

unsupported deductions and backcharges; (f) failing to make timely payments and pay interest penalties required by FAR 52.232-27 as incorporated into the Subcontract; (g) failing to make work available in accordance with the schedule and the sequence of work on which Pruhs' price was based; (h) hindering, delaying and obstructing Pruhs' work through performance directives and out-of-scope work demands; and (i) failing to process timely close out calculations and payment at the end of 2025.

87. As a direct and proximate result of Kiewit's breaches, Pruhs has been damaged in an amount to be proven at trial and currently estimated to exceed $22,000,000, plus interest, costs, and attorney fees under Section 20 of the Subcontract.

**COUNT III**
**BREACH OF CONTRACT — WRONGFUL TERMINATION FOR DEFAULT**
**(Pruhs v. Kiewit)**

88. Pruhs hereby incorporates all preceding paragraphs as though fully set forth at length.

89. Kiewit's February 11, 2025 partial termination for default, and subsequent termination, breached the Subcontract because Pruhs was not in default as the claimed failure arose from the unsuitability of the aggregate source designated and controlled by Kiewit.

90. Kiewit's own conduct prevented or hindered Pruhs' performance.

91. Indeed, Pruhs' performance of the airfield HMA scope using the designated source provided by Kiewit was impossible or commercially impracticable.

92. The condition arose from the Kiewit designated source and the requirements imposed during Pruhs' performance. Pruhs remained willing to pursue a compliant solution, but Kiewit terminated its scope while that effort was ongoing.

93. Because the termination for default was wrongful, Kiewit may not recover from Pruhs, by backcharge, setoff, reprocurement, or otherwise, any excess costs of completing the terminated work.

94. Pruhs is entitled to recover its damages arising from the wrongful termination.

95. Section 6(h) of the Subcontract should not be enforced to limit Pruhs' recovery because Kiewit's termination was undertaken in bad faith and for the improper purpose of shifting to Pruhs responsibility for a borrow-source deficiency that Kiewit had acknowledged was its own.

96. As a direct and proximate result of the wrongful termination, Pruhs has been damaged in an amount to be proven at trial, including lost profit and unabsorbed overhead on the terminated work, and, in the alternative, amounts recoverable under Section 6(f).

## COUNT IV
## Breach of the Implied Covenant of Good Faith and Fair Dealing
## (Pruhs v. Kiewit)

97. Pruhs hereby incorporates all preceding paragraphs as though fully set forth at length.

98. Alaska law implies in every contract a covenant of good faith and fair dealing.

99. Kiewit breached the covenant by, among other things: designating an unsuitable aggregate source and then holding Pruhs responsible for the consequences; terminating Pruhs for default to avoid its own responsibility while representing to the Government that the source was unsuitable; declining to support Pruhs' notices and claims to the Government; reallocating payments and imposing unsupported backcharges while refusing to provide supporting documentation; paying change-order work at unilaterally reduced prices after Pruhs had performed in reliance on agreed pricing; and purportedly invoking Subcontract provisions to shield the consequences of its own conduct.

100. Kiewit acted in its own self-interest in this regard, to the detriment of Pruhs.

101. In doing so, Kiewit breached the covenant of good faith and fair dealing and deprived Pruhs of the benefits of the Subcontract.

102. As a direct and proximate result, Pruhs has been damaged in an amount to be proven at trial.

## COUNT V
## Breach of Implied Warranty
## (Pruhs v. Kiewit)

103. Pruhs hereby incorporates all preceding paragraphs as though fully set forth at length.

104. Kiewit designated on-site Borrow Source Area 3 ("Pit 3") as the source of aggregate for the hot mix asphalt ("HMA") that Pruhs was to manufacture and place under the Subcontract.

105. By designating Pit 3 and requiring Pruhs to use it, Kiewit impliedly warranted that Pit 3 held enough competent material, of suitable quality, for Pruhs to produce the aggregates its Subcontract work required.

106. Kiewit also warranted that the information it furnished about Pit 3 was accurate and fit for that purpose.

107. Pruhs reasonably relied on Kiewit's designation, representations and furnished information pertaining to Pit 3.

108. Kiewit's representations proved to be false. After mobilizing to Pit 3, Pruhs assessed the material's quantity and quality. That assessment showed Pit 3 did not contain enough competent material to produce all required aggregates.

109. Kiewit breached its implied warranty because it designated and required the use of a borrow source that did not have the represented quantity and quality of material represented.

110. Pruhs was harmed as a direct and proximate result of Kiewit's breach and is entitled to recover damages in an amount to be proven at trial.

**COUNT VI**
**Quantum Meruit / Unjust Enrichment (Pleaded in the Alternative)**
**(Pruhs v. Kiewit)**

111. Pruhs hereby incorporates all preceding paragraphs as though fully set forth at length.

112. To the extent any of the extra work, materials, quantity overruns, or services described above is found to fall outside the Subcontract or any enforceable agreement on price, Pruhs conferred a benefit on Kiewit by furnishing that work and material at Kiewit's request.

113. Kiewit appreciated and accepted the benefit of that work and material, and on information and belief was compensated by the Government for it.

114. It would be inequitable for Kiewit to retain the benefit of that work and material, without paying Pruhs for its reasonable value.

115. Pruhs is entitled to recover the reasonable value of that work and material in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Pruhs respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

A. On Count I, against Travelers for all sums due to Pruhs for labor, material and equipment furnished in the prosecution of the work, in an amount to be proven at trial, not to exceed the penal sum of the Payment Bond;

B. On Counts II through VI, against Kiewit, for damages in an amount to be proven at trial, presently estimated to exceed $22,000,000;

C. For an award against Kiewit and Travelers for Pruhs' costs, interest and attorney's fees.

D. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Pruhs demands a trial by jury on all issues so triable.

DATED this 20th day of October, 2026.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By: ______________________
Adam W. Cook, ABA #0611071
Arina Filippenko, ABA #2311138